**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| A.F. an individual, | |
| Plaintiff, | Case No. _____ |
| v. | |
| G6 HOSPITALITY, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

## COMPLAINT

COMES NOW, the Plaintiff A.F. ("Plaintiff" or "A.F."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.     Plaintiff A.F. is a survivor of human sex trafficking.

2.     A.F.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.     A.F. met a person that groomed her into trafficking. Ultimately, her trafficker came to control every aspect of her life. The defining factor of the relationship between A.F. and her trafficker was that each night A.F.'s trafficker forced her to have sex with men for money.

4.     A.F. was trafficked at Defendant G6 Hospitality, LLC ("G6"). A.F. and her trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.     At G6's hotel, A.F. was forced to engage in sex with many men every day. Every new customer was another instance A.F. was forced to have sex against her will—that is to say, A.F. was raped multiple times per day by multiple men when she stayed at G6's hotel.

6.      A.F.'s trafficker forced her onto G6's properties where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.      At some point, A.F. was able to escape the grasps of her trafficker and the prison of G6's hotel rooms.

8.      A.F. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.      A.F. brings this lawsuit in an attempt to hold G6 accountable imprisoning her and benefiting from participating in a venture furthering her trafficking.

## OVERVIEW OF TRAFFICKING

10.     A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. While traffickers indiscreetly paraded throughout hotels, hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking ventures.

12.     G6 knew and should have known for decades that sex trafficking repeatedly occurs under its brand flags.

13.     Rather than taking timely and effective measures to thwart this epidemic, G6 chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

14. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers aren't the only profiteers. The hotel industry, including G6, makes millions from participating in ventures by renting rooms where trafficking victims are sexually exploited night after night. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15. The hotel industry ignored human trafficking on their premises and thereby enabled human trafficking in the United States to flourish.

16. G6 and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the G6's hotels worldwide and at their own properties. G6 and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

17. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by G6 and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that G6 and all industry participants continue to profit millions from participating in a commercial venture by renting rooms for human trafficking.

18. G6's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of A.F. on their properties.

19. A.F., a survivor of sex trafficking, brings this action for damages against G6 pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. G6

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

knowingly benefitted from participation in a commercial business venture that it knew or should have known to be engaging in sex trafficking acts in violation of 18 U.S.C. § 1591(a).

## PARTIES

20.     Plaintiff A.F. is a natural person and a resident and citizen of Albuquerque, New Mexico.

21.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

     a.    Due to the sensitive and intimate nature of the issues, Plaintiff A.F. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that G6 maintains the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[2]

     b.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[5]

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

c.      Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.      Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

e.      Moreover, G6 will not be prejudiced. Plaintiff will agree to reveal her identity to G6 for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that G6 will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

22.     **Defendant G6 Hospitality, LLC** ("G6") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees.  G6 is a Delaware corporation with its headquarters in Carrollton, TX.

23.     G6 maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company at 50 W. Broad Street, Suite 1300 Columbus, OH 43215.

24.     Motel 6 by G6 is classified as a value brand hotel.[7]

---

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).
[7] *Motel 6 – An Iconic American Brand,* G6 HOSPITALITY, https://g6hospitality.com/our-brands/

25.     G6 owns, supervises, manages, controls, and/or operates the Motel 6 located at 8510 Pan American Fwy NE, Albuquerque, NM 87113 ("Albuquerque Motel 6").

    a.  The Motel 6 by G6 is a G6 Hotels International, Inc. brand property.

    b.  G6 employees work throughout the Albuquerque Motel 6 by G6. G6 employees work jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at the Albuquerque Motel 6 by G6. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Albuquerque Motel 6 by G6 where A.F. was trafficked. G6 has an actual and apparent agency relationship with the physical property owner of the Albuquerque Motel 6 by G6 as to establish vicarious liability.

    c.  G6 controlled and dictated the actions and inactions of the Albuquerque Motel 6 by G6 through highly specific and detailed brand standards, policies, and procedures.

    d.  G6 knowingly benefited, or received something of value, from its commercial business venture at the Albuquerque Motel 6 by G6 through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where A.F. was trafficked, as well as in maintaining a positive public image for the Motel 6 brand.

    e.  G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio,

such as the Albuquerque Motel 6 by G6, contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio, has caused injuries to A.F. in Ohio and profited from a commercial business venture which unlawfully permitted criminals to sell A.F. for commercial sex at the Albuquerque Motel 6 by G6 in Ohio.

f.  Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of G6.

## JURISDICTION AND VENUE

26.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

27.  There exists a diversity in citizenship between the Plaintiff and Defendant and the amount in controversy exceeds Seventy-Five Thousand Dollars. This court has jurisdiction pursuant to 28 U.S.C. § 1332.

28.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(d).

## FACTUAL BACKGROUND

### INTRODUCTION

29.  A.F. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

30.     The TVPRA prohibits G6 from engaging in any venture they knew or should have known involves trafficking, and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in and benefiting from what they know or should know involves trafficking.

31.     An overwhelming majority of commercial sex trafficking transactions occur within hotels and motels, as traffickers use their rooms as the hub for their operations.[8] Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.

32.     Hotels offer anonymity, non-traceability, privacy, and discretion, making them ideal venues for sex trafficking.

33.     As part of its conspiracy, to save costs and continually reap millions of dollars in profits, G6 generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. Furthermore, G6 did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

34.     G6 kept no reports or data on suspected incidences or occurrences of human trafficking on its properties, the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures, or the number of rooms that G6 refused to rent or refunded as a result of identifying the venture as one engaged in trafficking. G6 did not establish mandatory and secure reporting mechanisms at the point of sale.

---

[8] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754 .

35.     With little to no risk posed to traffickers seeking to use G6's rooms as a location to force victims like A.F. to engage in commercial sex against her will, the sex trade continues to thrive at G6's branded properties. Everyday victims of human trafficking like A.F. are repeatedly exploited within the rooms of G6's branded properties across the country.

36.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

37.     G6 is jointly and severally liable for the Plaintiff's damages in this case.

## THE SEX TRAFFICKING OF PLAINTIFF A.F.

38.     A.F. met her trafficker when she was twenty-four (24) years old.

39.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, A.F. was held captive and sold for sex by her trafficker.

40.     During the time she was trafficked, A.F.'s trafficker frequently rented rooms at the G6's Albuquerque Motel 6 because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with A.F.

41.     Throughout her trafficking, A.F.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage and Craigslist advertising for A.F.'s availability for commercial sex. A.F.'s trafficker posted many of these advertisements and had conversations with "johns" while connected to G6's Wi-Fi.

42.     A.F. was forced to have sex with multiple "johns" every day she was trafficked in G6's Albuquerque Motel 6.

43.     While at the G6's Albuquerque Motel 6, A.F.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

44.     During her captivity at G6's Albuquerque Motel 6, A.F. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

45.     A.F. encountered the same staff on multiple occasions. G6's staff would have seen the signs of A.F.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse.

46.     The trafficker of A.F. followed a repetitive and routine procedure during stays at the G6's Albuquerque Motel 6 to which G6 knew or should have known of A.F.'s trafficking because of a variety of factors detailed below.

**THE SEX TRAFFICKING OF A.F. AT THE ALBUQUERQUE MOTEL 6**

47.     A.F. was trafficked at the Motel 6 located at 8510 Pan American Fwy NE, Albuquerque, NM 87113. A.F. stayed at this location from January 2017 to September 2018 staying days at a time at this location.

48.     Every day, A.F.'s trafficker interacted with the Albuquerque Motel 6 by G6 staff. The front desk staff was the same woman consistently for the full two (2) years, always checking in A.F. and her trafficker.

49.     A.F. constantly was loudly yelling and fighting with her trafficker, begging for someone to help her at all hours of the day and night. Yet no one from the Albuquerque Motel 6 by G6 came to A.F.'s rescue.

50.     A.F.'s trafficker would leave the room when the johns would arrive. The hotel staff would bring the johns up to A.F.'s room. With each time A.F. the hotel staff would let the johns into A.F.'s room, she would scream and beg for help, but the hotel staff did absolutely nothing.

51.     The staff at the Albuquerque Motel 6 by G6 observed A.F. on countless occasions where it was physically apparent that she was routinely being brutally beaten. She appeared bruised, emaciated, unwashed, sleep deprived and distraught in front of hotel staff, and also avoided eye contact during interactions with anyone outside of the room.

52.     Further, with each stay at Albuquerque Motel 6 by G6, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Praying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Unusually large number of used condoms left in the trash; Large numbers of male visitors asking for A.F. and/or her trafficker at the front desk; Visible signs of prior or private physical abuse; Loud noises of abuse or other emergency audible to staff or other rooms; Unusually large numbers of male visitors coming in and out of A.F.'s room; and loitering/soliciting on hotel grounds.

53.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Albuquerque Motel 6 by G6.

54.     These red flags were open and obvious to anyone working at the Albuquerque Motel 6 by G6 and lasted consistently for two years.

**G6'S KNOWLEDGE OF SEX TRAFFICKING AT ITS BRANDED LOCATIONS**

55.     G6 is aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[9] The United Nations,[10] international non-

---

[9] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[10] *Global Report on Trafficking in Persons*, UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84

profits,[11] and the U.S. Department of Homeland Security,[12] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. G6 cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds its industry.

56.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for its hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

57.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[13] and domestically in 2010 with the

---

8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[11] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[12] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[13] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

Department of Homeland Security's Blue Campaign.[14] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

58.     G6, on information and belief, has access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. G6 nevertheless does not share such information with other hotel locations, thereby preventing other hotel locations from acting to protect the victims of such suspected human traffickers.

59.     G6 also has access to public police reports, news reports, and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

60.     G6 has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

61.     A brief examination of just a handful of examples suffices to show the extraordinary frequency with which G6 has long received and continues receiving evidence and reports that human trafficking runs rampant at its hotel locations:

> a.  Regarding a stay in November 2017 at the Albuquerque Motel 6 by G6, a hotel customer wrote a review saying, "This is the worst I've ever seen. Prostitutes coming in and out. People telling. Smelt like cheap perfume and

---

[14] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

dirty laundry when I checked in smelt like a sewer when I checked out. The sheets were dirty I was afraid to even sit on the bed. My daughter made these reservations on line. I got there at 2am it was 3am before I got checked in and I left the room by 7am. It was 2pm before my daughter and I were able to go back and get my luggage. Due to holiday obligations and after speaking with expedia she had to pay for new accommodations for me. I don't know if she was refunded anything but she shouldn't be charged anything. She stood at the front desk for 5 minutes waiting for someone and no one did she had to leave because she was going to be sick from the smell. I would like to say that Joe at the front when I checked in was very pleasant."

## G6 FACILITATED THE TRAFFICKING OF A.F.

62.     G6 is a signatory of the Code[15] and thereby have promised to adopt these policies to combat trafficking. Yet, G6, upon information and belief, has failed to implement most, if not all of these policies.

63.     G6 is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and G6 publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, G6 should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

64.     G6 profited from the sex trafficking of Plaintiff A.F. G6 rented rooms to A.F.'s trafficker when they knew, or should have known, that human trafficking was prevalent within its branded properties and at the specific locations where A.F. was trafficked. The hotel staff,

---

[15] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

especially front desk staff, at G6's properties knew or should have known of the obvious signs of A.F.'s trafficking.

65.    G6 benefited from the steady stream of income that A.F.'s trafficker and "johns" bring to its hotel brands. G6 profited from each and every room that A.F.'s trafficker and customers rented.

66.    G6 has made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. G6 should have been aware of human trafficking occurring at the locations where A.F. was trafficked given G6 had access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

67.    Moreover, G6 repeatedly collected data on A.F., her trafficker, and her "johns" from her many stays at Albuquerque Motel 6 by G6, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. G6's employees witnessed the obvious signs of A.F.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, G6 failed to take reasonable measures to stop sex trafficking from occurring in its hotels. If G6 would have taken proper measures, A.F. and other victims like her, would not have been trafficked at its locations.

68.    G6 discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where A.F. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual

conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

69.     Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where A.F. was trafficked and reported this to G6 or would have if G6 did not fail to institute reasonable policies and procedures.

70.     In addition, G6 had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems. These systems, which G6 required its branded properties to use, were defective in ensuring customer safety and, specifically, identifying and mitigating suspected and actual incidents of human trafficking on G6's properties.

71.     A reasonably diligent hotel brand in the G6 position would have included policies and procedures to identify and mitigate guest safety issues related to human trafficking in its franchise agreements, brand standards, and systems standards. Upon information and belief, Defendants' branded properties would have expected this material to be included in G6 policies and procedures. By failing to include such policies and procedures, G6 led the branded properties to be negligently managed.

72.     Instead, G6 negligently required the branded properties to adopt injurious procedures that allowed trafficking to continue and thrive at G6's properties, such as failing to accurately identify customer complaints that raise red flags of trafficking and take meaningful steps to address them. G6 provided and operated defective systems for daily property operations,

management, policies, procedures, and training that were incapable of determine whether they were generating revenue as a result of renting rooms where victims of trafficking were harbored and sold for commercial sex.

73.     G6 voluntarily undertook and assumed a duty to protect the safety of guests at the branded property where Plaintiff was trafficked, such as security, criminal activity, food safety, emergency response protocols, and fire equipment, among others.

74.     G6 did not exercise reasonable due diligence and care in selecting franchisees to operate its branded properties. G6 failed to conduct background checks and additional investigations to identify customer safety and security risks. G6 failed to conduct investigations such as background checks background and additional due diligence to identify whether they sold and licensed their systems and brands to a company able to secure customer safety and security risks.

75.     G6 negligently designed the layout and structure of the franchised unit or approved the layout and design of the interior or exterior of the hotel property so that red flags of human trafficking were hidden.

76.     G6 failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to prevent sexual exploitation on its properties. G6 maintained its deficiencies to maximize profits by:

      a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

      b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated

sex trafficking was occurring and taking the steps necessary to remedy the problems;

c.  Collecting and utilizing massive amounts of data from all of its branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in its hotels;

d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.  Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on its properties.

77.    As a direct and proximate result of these egregious practices on the part of G6, A.F. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## **G6'S CONTROL OVER ITS BRAND HOTELS**

78.    In the hotel industry, Defendants are major hotel corporations that hold, own, manage, and operate trademarks, licenses, and standard operating systems for hotel brands. As parent companies with decades of expertise in the hotel industry, Defendants provide property

owners with standard operating systems that control the daily operations and management of Defendants' branded properties.

79.     Upon information and belief, it is a standard practice in the hospitality industry, followed by G6, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

80.     G6 provides their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

81.     G6 provides their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to its brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by G6.[16] G6 sees booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[17]

82.     The staffing decisions at the individual hotel locations are sufficiently controlled by the G6 as to render staff at those locations' agents and joint employees of the brand manager G6 and the individual hotel locations. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

---

[16] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[17] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

83.     The staff at individual locations, including the locations at which A.F. was trafficked, took affirmative actions, as agents of the G6, to provide lodging to individuals who the staff and the Defendants knew or should have known were engaged in human trafficking, therefore, upon information and belief, G6 are vicariously liable.

84.     Upon information and belief, G6 requires their branded hotel properties to use a property management system, which is linked to G6's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions internet and technology, and guest safety.

85.     Essentially, G6 provide a hotel in a box. Branded property owners only provide the physical property, while Defendants provide everything else required to operate and manage the hotel down to the minute details of daily operation. Branded properties must follow G6's strict standards to receive the right to operate one of G6's brands.

86.     Upon information and belief, per the relevant franchise agreements,[18] G6 may enforce their brand standards by means of periodic inspections of its brand hotel locations to monitor compliance. If G6 branded properties fail to comply with G6 standards, G6 penalize properties with fees and the, backed up with the ultimate threat of termination of the franchise agreement.

87.     G6 exercises day-to-day control over the Albuquerque Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over Albuquerque Motel 6, as either direct subsidiaries or under the terms of its franchise agreements.

88.     Upon information and belief, G6 controls the operations of its branded properties

---

[18] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

      a. Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

      b. Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

      c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

      d. Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

      e. Requiring branded properties to pay fees based of the percentage of gross room revenues;

      f. Providing advertising requirements and standardized marketing services for the branded locations;

      g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

      h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

      i. Regulating employment policies at branded location including training and orientation materials for staff;

      j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the

branded property without G6's permission;

    k.  Regulating the rates for room rentals; and

    l.  Insurance coverage requirements.[19]

89.    G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

90.    G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.[20]

91.    G6 requires branded properties to use a centralized, cloud-based reservation and property management system.[21]

92.    G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[22]

93.    G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.[23]

---

[19] *See e.g.* 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017-fdd-summary/motel-6-2017-fdd/
[20] G6 offers a centralized reservations system on its website, a customer support channel, and press releases and announcements about the Motel 6 brand through g6hospitality.com; G6 also offers a reward program specific to the Motel 6 brand. *See Join My6,* MOTEL 6, https://www.motel6.com/en/home/my6/join.html
[21] *See* Michal Christine Escobar, *2020 Enterprise Innovator: Motel 6,* HOSPITALITY TECHNOLOGY, https://hospitalitytech.com/2020-enterprise-innovator-motel-6
[22] G6 Hospitality. *Privacy Policy,* https://www.motel6.com/en/home/policies/privacy-policy.html
[23] Motel 6, *Web and Mobile Ethical Vulnerability Disclosure Policy,* https://www.motel6.com/en/home/policies/vulnerability-disclosure.html

94.     G6 requires branded properties to comply with its corporate policies relating to

Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance

with the law.[24]

## **CAUSE OF ACTION**

### **COUNT 1: 18 U.S.C. § 1595 ("TVPRA")**

95.     Plaintiff incorporates each foregoing allegation.

96.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a)

and is entitled to bring a civil action under 18 U.S.C. §1595.

97.     G6's acts, omissions, and commissions, taken separately and/or together, outlined

above, constitute a violation of 18 U.S.C. § 1595. Specifically, G6 had a statutory obligation not

to benefit financially or receive anything of value from a venture that they knew, or should have

known, engaged in violating the TVPRA. At all relevant times, G6 breached this duty by

facilitating human trafficking through its participation in a commercial business venture which

involved the harboring of Plaintiff and her trafficker for the purposes of commercial sex induced

by force, fraud, or coercion.

98.     G6 has benefited as a result of these acts, omissions, and/or commissions by

keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand

of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received

payment for rooms or received payments or kickbacks for internet usage, G6 directly benefitted

from the sex trafficking of Plaintiff. The actions, omissions, and/or commissions alleged in this

pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

99.     Plaintiff has suffered substantial physical and psychological injuries as the result

---

[24] *Combatting Human Trafficking,* G6 HOSPITALITY, https://g6hospitality.com/about-us/combating-human-trafficking/

of being trafficked and sexually exploited at the Albuquerque Motel 6 by G6.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## TRIAL BY JURY IS HEREBY DEMANDED

Respectfully submitted,

WEEMS HAZEN LAW, LLC

*/s/ Bridget Hazen*
Bridget Hazen
Dathan Weems
106 Wellesley Drive SE
Albuquerque, NM 87106
(505) 247-4700
Bridget@weemshazenlaw.com

Dathan@weemshazenlaw.com
*Attorneys for Plaintiffs*