| | |
|---|---|
| **A.F., an individual,** | **Case No. 1:23-cv-879** |
| **Plaintiff,** | **CHIEF DISTRICT JUDGE KENNETH J. GONZALES** |
| **v.** | **Chief Magistrate Judge Gregory Wormuth** |
| **G6 HOSPITALITY, LLC,** | |
| **Defendant.** | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff A.F. files her Response in Opposition to the Motion for Summary Judgment filed by Defendant G6 Hospitality, LLC ("Defendant" or G6"). (Dkt. 130.) This Court directed Plaintiff to file her Response fourteen (14) business days after she certified that discovery was complete. (Dkt. 183.) While Plaintiff was unable to certify that G6 had complied so that discovery was complete (Dkt. 187), she files this Response within the time allotted if she had been able to certify. For these reasons explained herein, A.F. respectfully moves this Court to **DENY** Defendant's Motion for Summary Judgment and allow this case to go to a jury.

### INTRODUCTION[1]

A.F.[2] is a survivor of human trafficking in one of its most extreme forms—her trafficker advertised her using the internet at the Motel 6 in Albuquerque New Mexico for men to hide in her room, surprise attack, and rape her.[3]

---

[1] All Exhibits are attached to the Declaration of Counsel.

[2] Pursuant to the Protective Order in this case, Dkt. 23, Plaintiff will refer to herself and her trafficker ("P.F.") by their initials. Plaintiff has moved to file under seal any document containing their identifying information.

[3] Ex. 1, Rogs. at 11. ("Plaintiff provides that her trafficker would habitually use Defendant's internet to post solicitations online for individuals seeking to participate in a "staged" raping. Individuals would arrive at the motel where Defendant's employee would grant access to

The first surprise-rape at the Albuquerque Motel 6 occurred when A.F. had the only key, and A.F. was the only registered guest.[4] She left her room and upon returning, she was shocked to find her trafficker half naked in the room.[5] Her trafficker shut the door behind her, and "this guy came out of the bathroom with a ski mask and rope and started attacking" her.[6] Even still, "Motel 6 granted unfettered access to [her] room to unregistered individuals without [her] consent or notification."[7]

G6 *admits* that while there is a policy against it, if a couple had been seen together, G6 would provide a key to the unregistered guest.[8] A.F. and her trafficker *had been seen* and heard numerous times at that Albuquerque Motel 6, including A.F. "screaming or crying for help" as she "walk[ed] out the front door. . . passing by" the female employee "in order to leave."[9] A.F. "was not . . . trying to hide to walk out. I'd pass right by her."[10] A.F. believes that two employees saw her and that it happened more than once."[11] The female employee "was omnipresent over the entire duration of her trafficking."[12] And A.F. continued to be sold for rape multiple times in the rooms of the Albuquerque Motel 6—usually the one across from the elevator.[13]

---

Plaintiff's room whether she was there or not. Defendant's employee or the trafficker would open the door to the individual. If Plaintiff was there, the individual would rape her, or if she was not there, would lay in wait wearing a ski mask and then rape her when she arrived at the motel. 20"); Ex. 2, Pl. Dep. Tr. 106:12-25.

[4] Ex. 2, Pl. Tr. 106:12 through 109:11.

[5] *Id*. at 145:12 through 146:23

[6] *Id*.

[7] Ex. 2, Pl. Dep. Tr. 161:5-17. Ex. 1. Rogs. at 3, 5.

[8] Ex. 3(a), Scott Dep. Tr. 63:11-64:35.

[9] Ex. 2. Pl. Dep. Tr. 168:6-25

[10] Ex. 2. Pl. Dep. Tr. 169:1-25.

[11] Ex. 2. Pl. Dep. Tr. 153:16-20.

[12] Ex. 1, Rogs. at 6. Ex. 2, Pl. Dep. Tr. 108:2-109:11; 140:4-141:24; 230:25-231:1.

[13] Ex. 2, Pl. Dep. Tr. 146:24-147:7.

2

Plaintiff brings this case under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA"), which reflects Congress's expansion of liability beyond criminal traffickers to those who facilitate trafficking, even if unknowingly.[14]

> [In the] two and a half of decades of antitrafficking policy and legislation have centered on a "3 P's" paradigm: prosecution, *prevention*, protection.[15] The Trafficking Victims Protection Act of 2000 marked the beginning.[16] With each amendment and reauthorization since, Congress has repeatedly and deliberately chosen to expand the scope of liability for sex trafficking conduct.[17] The wisdom underlying the civil liability provision is two-fold: it supports antitrafficking government efforts by empowering and incentivizing victims to sue for trafficking violations irrespective of criminal prosecution for those violations,[18] and it targets the financial motivations and the infrastructure that allows trafficking organizations to thrive.

### STATEMENTS OF MATERIAL FACTS

Plaintiff sets forth evidence of the material facts, corrects G6's factually inaccurate statements, responds to G6's contention that the facts it sets out are "undisputed," and points out when G6 seeks a reasonable inference in its favor.

**A.      Plaintiff Has Set Forth Evidence that She Was Trafficked at the New Mexico Motel 6 Multiple Times; G6's Suggestion that She Only Stayed at the Motel 6 Three Times is Misleading and Simply Ignores the Evidence**

1.      G6 makes the factually inaccurate statement that it cannot be held liable in this case because "the record shows that Plaintiff stayed at this property on only three nights, one that she

---

[14] *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-cv-00849, 2025 LX 464442, at *6 (S.D. Ohio Sep. 22, 2025 (citations omitted) (denying summary judgment).

[15] *See* U.S. Dep't of State, Trafficking in Persons Report 5 (2009) ("The most recent amendments to the TVPA were enacted in December 2008. The purpose of the law is to punish traffickers, protect victims, and prevent trafficking from occurring.").

[16] *See* Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (Oct. 28, 2000).

[17] *See e.g.*, M.A. footnote for full Congressional Record.

[18] Charles Doyle, Cong. Research Serv., R40190, *The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L. 110-457): Criminal Law Provisions*, 15-16 (2009) (describing Section 1595 as "creat[ing] civil liability both for those who face criminal liability for their profiteering and those who do not").

rented, one that she rented but refused to pay for, and one that her father and one that her father rented for her—to escape (as she testified) from her [alleged trafficker]."[19] Not so.

2.      The record shows that G6 has only three *stay records* in A.F.'s name at Albuquerque Motel 6 during the alleged trafficking period, which is not the same thing as evidence of the *number of stays*. The evidence confirms that not only does G6 have the stay records for A.F., it also has stay records for her trafficker during the trafficking period.[20] The evidence also shows that it was likely that Plaintiff stayed at the Motel 6 under reservations in her family members' names[21] and that she checked in with her trafficker at least on one occasions.[22]

3.      That G6 only has certain stay records does not mean that there were no stays.[23] A reasonable jury could conclude that Plaintiff and her trafficker stayed at the Albuquerque Motel 6. Indeed, at this time the evidence stands uncontroverted.

4.      A.F. was sexually abused hundreds of times at the Albuquerque Motel 6, which does not mean she had to stay their hundreds of nights—her testimony was clear that she was abused repeatedly by each john to whom she was sold (the details are nauseating).[24] The evidence shows that A.F. was physically dragged to the Albuquerque Motel 6 by her trafficker on one occasion, put in a room and beat until she had sex with a john.[25]

---

[19] Def. Mot. for Summ. J. at 1.
[20] Def. Mot. for Summ. J. at 5, n.2 and Ex. 4 Trafficker Stay Records, Grapes Decl. ¶ 6.
[21] Ex. 2, Pl. Dep. Tr. 151:9-16 (family members reserved rooms, "[t]here could have been some under [C.A.]; There could have been some under [A.F.'s mother or father's names].").
[22] Ex. 2, Pl. Dep. Tr. 148:7-9.
[23] *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 2:19-cv-00849, 2025 LX 464442, at *31-32 (S.D. Ohio Sep. 22, 2025) ("defendants harp on the absence of stay records at their properties that bear M.A.'s name or the names of her traffickers" but found that a based on the evidence viewed most favorably to Plaintiff, this evidence may lead a reasonable jury to conclude that L.R. rented rooms at the MGH even in the absence of stay records in his name.").
[24] Ex. 2(a), Pl. Dep. Tr. Exhibits 17-20, 21, 22, 37-30 (hundreds of photos and videos).
[25] Ex. 2, Pl. Dep. Tr. at 104:20-25; Tr. at 104: 1-7 (dragged to room).

5. In G6's first paragraph of its Introduction, G6 suggests that A.F.'s choice not to sue her trafficker somehow makes her claim less believable, stating that she seeks justice from G6 for benefitting from her trafficking, yet "has not sued her former partner as a defendant."[26] Simply because A.F.'s trafficker was her "former partner" does not make the horror of her trafficking somehow less.

6. G6 continues throughout to accuse A.F. because she did not tell anyone with words that she was being trafficked. A.F. did not use words to tell anyone during the trafficking because, as she testified: "I feared my life. Up until the point that [my trafficker] got arrested, I mean, then I was willing to pursue everything. But I was not safe until he got locked up. . . . My kids weren't safe until he got locked up."[27]

7. A.F.'s fear was not unfounded. On June 28, 2018, her trafficker beat her nearly to death. The medical records show that she was beaten unconscious, "choked, hit with fists/flashlight/lamp to head . . . as well as blows to whole body, kicked, and bit in L. upper arm. . . .[by PF]"[28] P.F. was charged and convicted of felony assault for this beating. [29]

8. After her trafficker was arrested for this beating, A.F. told Commander Kyle Hartsock with Albuquerque Police Department and Lisa Vigil-Roybal with 2nd Judicial District Attorney that P.F. forced her into sex trafficking.[30] G6 highlights that the D.A. did not charge P.F. with trafficking, suggesting that trafficking did not occur—in other words, drawing inferences in the favor of the movant, G6. Instead, there is a reasonable inference to be made that prosecutors

---

[26] G6's Mot. for Summ. J. at 1.
[27] Ex. 2, Pl. Dep. Tr. at 159:2-7 (feared for he life and children's lives).
[28] Dkt. 195-1, Robitz, MD Report, AF-UNMH 000050
[29] Ex. 2(a), Pl. Dep. Ex. 17 (Albuquerque Police Department Case No. 180062245) AF.NMD.000804-806; Ex. 2, Pl. Dep. Tr. 191:14-192:7.
[30] Ex. 1, Rogs. at 9.

often do not charge every crime that is committed. A prosecutor's choice of what to charge does nothing to call her testimony into question.[31] Neither law enforcement nor the DA involved ever concluded that A.F. was *not* a trafficking victim. The Attorney General's office put P.F. on a list of traffickers.[32] This is why A.F. did not sue her trafficker.

9.     As a result of sex trafficking, A.F. has been diagnosed with anxiety, depression, severe post-traumatic stress disorder (PTSD).[33] Her emotional and mental state have caused physical issues as well, including sinus dental issues from being beat in her face and head. She suffers from nightmares, loss of sleep, loss of appetite, panic attacks, anxiety attacks, and memory lapses.[34]

**B.     Indicators of Sex Trafficking Were Present When Plaintiff Stayed at the Motel 6**

10.     Several red flags indicated crimes were being committed at the Albuquerque Motel 6, such as: booking and paying for stays one day at a time for several days in a row; obvious signs of illegal drug use; an unusually large number of used condoms left in the trash; large numbers of male visitors to and from A.F's room; visible signs of physical abuse; noises of altercations and abuse that would have been audible to staff or other rooms; and loitering/soliciting on hotel grounds.[35] These red flags were open and obvious to anyone working at the Albuquerque Motel 6 owned and operated by Defendant G6.[36]

---

[31] *See* Farrell, A., Adams, W., Dank, M., Owens, C., Fahy, S., Pfeffer, R., & McDevitt, J. (2012, April). *Identifying Challenges to Improve the investigation and prosecution of state and local human trafficking cases*. National Institute of Justice. Retrieved February 3, 2022, from https://nij.ojp.gov/topics/articles/improving-investigation-and-prosecution-state-and-local-human-trafficking-cases (finding that prosecutors face multiple challenges associated with human trafficking cases).

[32] Pl. Dep. Tr. 177:5-178:8; Ex. 1, Rogs. at 9.

[33] Robitz, MD Report AF-UNMH 000289, AF-Lovelace 000003-4, AF-FCS 000001, 000008;

[34] Ex. 2, Pl. Dep. Tr 70:19-25; Robitz Ex. Rep. Dkt. 195-1.

[35] Am. Compl. ¶ 61.

[36] *Id*. ¶ 62.

11.     G6 contends that "Plaintiff's own testimony *disclaimed* nearly all 'red flags' that her attorneys pleaded."[37] G6 does not support this assertion with any evidence. In A.F.'s deposition, G6 did not ask her about any of these red flags. The only evidence before the Court is Plaintiff's complaint, verified interrogatories, and her deposition testimony. None of which support G6's statement, indeed the opposite.

12.     G6 contends that "the record generally supports none of the 'red flags' Plaintiff alleged in her complaint. FAC ¶ 61."[38] G6 bases this statement on its improper disregard of *all* evidence except for the three stay records and the two ambushed rapes. G6 concludes, incorrectly, that "[t]he lone 'red flag' alleged in the complaint that even arguably finds support in the record is bruising that Plaintiff says she incurred during a one-night stay," and "Plaintiff could not testify that any employee in fact saw her bruising at all." Again, not so.

13.     A.F. testified that the female employee at the front desk had to have seen her bruising. A.F. testified that "[i]t was obvious. I had black eyes, like I'd walk in with no black eyes and leave with black eyes."[39] G6 requires its front desk employees to greet everyone when they come into the lobby— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[40]

**C.      Stay Records Indicate that Plaintiff's Trafficker Had a Continuing Business Relationship with G6, and Evidence in the Record Indicates that G6 Provided Room Keys to Plaintiff's Trafficker Even when he Was Not a Registered Guest**

14.     Plaintiff,[41] her trafficker,[42] and Plaintiff's parents rented rooms[43] at the Albuquerque Motel 6 during the trafficking period, from 2017 through 2018.[44] Because of AF's

---

[37] Mot. for Summ. J. at 1.
[38] *Id*. at 18.
[39] Ex. 2, Pl. Dep. Tr. 167:15-168:5.
[40] Ex. 3(a), Walker Dep. Tr. 57:9-58:8.
[41] Ex. 2, Pl. Dep. Tr. 151:3-11.
[42] Def. Mot. for Summ. J. at 5, n.2 and Ex. 4 Trafficker Stay Records, Grapes Decl. ¶ 6.
[43] Ex. 2, Pl. Dep. Tr. 151:9-16.
[44] Ex. 1, Rogs. at 1.

parents' attempts to keep her away from her trafficker, they at times rented rooms at the Albuquerque Motel 6 in their names or paid for A.F. and put the room in her name—either way, A.F. was the only registered guest and had obtained only one key.[45] This is what occurred before the first surprise-rape at the Albuquerque Motel 6.[46]

15.    G6 highlights that A.F. cannot provide the exact dates on which she was trafficked does not impact her sworn testimony and the stay records. G6 contends that A.F. could not "explain how she came up with that time frame" citing to her deposition at page 135:6-21.  That testimony specifically states that her mother helped her figure out the dates.

16.    G6 contends that "Plaintiff testified that she can recall only two specific incidents of P.F. trafficking her at the property. *Id*. 107:5-12."  This is not accurate. On page 107 of A.F.'s deposition, she was testifying about two of the surprise-rapes at the Albuquerque Motel 6—not the only times she was trafficked at the property.

**D.    G6 Benefitted from Renting the Rooms Where Plaintiff Was Harbored and Sex Trafficked; Providing the Wi-Fi Used to Place Sex Ads Online**

17. A.F. testified about many occasions, but she was particularly alarmed when she had the only key to her room, she "left for a short time and came back to find [P.F.] in my room and somebody else in the bathroom" and her trafficker beat her until she had sex with the person.[47] Similar encounters occurred multiple times, with different men at the Albuquerque Motel 6.[48]

18. A.F. and her trafficker were locals and were known at the Albuquerque Motel 6, and at times did not pay in advance. A.F. testified that the Albuquerque Motel 6 would allow them to pay for rooms after they stayed.[49] A.F. and her trafficker had checked in together at least once and

---

[45] Ex. 2, Pl. Dep. Tr. 148:1-12.
[46] Ex. 2, Pl. Dep. at 108:2-109:11; 140:4-141:24.
[47] Ex. 2, Pl. Dep. Tr. 106:12-107:18.
[48] *Id*. 108:2-109:11; 140:4-141:24
[49] Ex. 1, Rogs. at 7. Ex. 2, Pl. Dep. Tr. 108:2-109:11; 146:24-147:7; 140:4-141:24; 230:25-231:1.

booked rooms for both of them once or twice.[50] They were almost always given the same room, directly across from the elevator.[51]

19.  P.F. would beat Plaintiff until he got access to her Facebook, google drive, and text messaging.[52] He would post pictures and videos of A.F. online for rape situations from the Albuquerque Motel 6 internet.[53] A.F. screamed for help during these incidents.[54] Some of the rapists stopped when they realized it was not a voluntary situation and others did not.[55]

20.  A.F. provided voluminous discovery to G6 of these pictures and videos.[56]  In a post[57] it is clear that money is to be exchanged for sex and that A.F. and her trafficker did not have money for a hotel room.[58] A.F. was forced to film the ads, or she would get beaten until she did.[59] P.F. used these posts for commercial sex solicitations and if she refused he would beat her until she submitted.[60]

21.  "G6 has benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, G6 directly benefitted from the sex trafficking of Plaintiff."[61] G6 had access to much of this data through the management of a centralized data system, including but not limited to the booking, credit processing, and information technology and internet systems.[62]

---

[50] Ex. 2, Pl. Dep. Tr. 148:1-9.
[51] Ex. 2, Pl. Dep. Tr. 146:24-147:7.
[52] Ex. 2, Pl. Dep. Tr. 25:25-26:17.
[53] Ex. 2, Pl. Dep. Tr. 59:19-61:4, 149:5-20.
[54] Ex. 2, Pl. Dep. Tr. 159:22-160:19; AF Ex. 2(a) with Exhibit 22.
[55] *Id.*
[56] Decl. of Counsel ¶ 4.
[57] Ex. 2(a) with Exhibit 16.
[58] Cite from boss 2
[59] Ex. 2, Pl. Dep. Tr. 198:1-17.
[60] Ex. 2, Pl. Dep. Tr. 104:1-105:12.
[61] Am. Compl. ¶ 90
[62] *Id.* ¶ 79.

**E.    G6 Knew It Faced a Company-Wide Risk of Sex Trafficking Occurring at its Hotels as Early as 2008**

22.    The highest level of leadership at G6 knew as early as 2008 that trafficking is a known issue in the hotel industry.[63] G6 knew[64] that prostitution was problem at Motel 6 locations: ███████████████ ████████████████████████████████████[65] In December 2012 an emailed titled "█ ███████████████████████."[66]

23.    Also since 2008, G6 knew that prostitution[67] was arranged online (through sites like Craigslist and Backpage) from G6 properties and that this was "███████████████████ █████████████████████████████████." [68]  Head of Security Glover also testified that █████████████████████████████████████████, it was an issue and that it was ████████████████████████████████[69]

24.    Over the next nine (9) years that G6 failed to weed out the sex trafficking at the Albuquerque Motel 6 as shown by the corporate survey reports G6 keeps about its properties.  The Albuquerque Motel 6 documents show, *inter alia*, a December 2017 review: ███████████████ ██████████████"[70] And in September 2017, saying "█████████████████████ █████████████████████████████████[71]  These reviews were during the exact time period as A.F. was being trafficked at that same location.  A reasonable jury certainly could find that G6 knew or should have known of sex trafficking at the Albuquerque Motel 6.

---

[63] Ex. 4, Glover Dep. Tr. 54:22-55:3.
[64] Ex. 6, Williams Dep. Tr. 47:4-18.) (with the company since 2007 and was Division Vice President from 2016-2018.
[65] Ex. 5, VanBeest Dep. Tr. 127:9-128:16.
[66] Ex. 4, Glover Dep. Tr. 218:3-220:16; Ex. 4(a). Ex. 22 to Glover Dep.
[67] For many years victims of trafficking were thought to be prostitutes.
[68] Ex. 4, Glover Dep. Tr. 118:21-119:16.
[69] Ex. 4, Glover Dep. Tr. 54:5-15.
[70] Ex. 8, Snyder Dep. Tr. 13:20-14:23; 96:19-97:6; 98:12 -100:8; 104:24-105:21; Ex. 8(a). Ex. 1 to Snyder Dep., G6(AF)0000973
[71] *Id*.

25.     G6's suggestion that these complaints were not important because they were a small percentage of the reviews it received[72] misses the mark. The overwhelming focus on murder is disproportionate to the percentage of crimes that are murders—it is the quality of the crime, not the quantity that should be the guide when it comes to customers being sold for sex at a hotel.

26.     G6's head of security asserted internally that prostitution ads on the internet were "█████████████████████████████████████████████████████."[73] This statement was given in response to an article outlining shifting attitudes towards prostitutes—to see them as victims the police are trying to "rescue" from their pimps.[74]

27.     The "boots on the ground" Motel 6 employees ██████████████████████.[75] The threat of prostitution is ever-present at Motel 6 locations, and "████████████" there.[76]

**F.      Although G6 Knew of The Risk of Sex Trafficking Occurring Across Its Hotels, G6 Failed to Follow Industry Standards and Conduct a Risk Assessment**

28.     There was no risk assessment, no industry standards followed; no assessment of rate an prevalence.[77] By no later than 2012, the Polaris Project[78] had published detailed guidance for hotels identifying indicators of hotel-based trafficking.[79] G6 was corresponding with Polaris Project ████████████████████████████████████████████████ ████████████████████████████████████████.[80]

---

[72] Def.'s Mot. for Summ. J. at 7, ¶ 13.
[73] Ex. 4(a). (Exhibit 3, Glover Dep., G6(AW)0004083-85, 06/02/2008.)
[74] Ex. 4(a). (Exhibit 3, Glover Dep., G6(AW)0004083-85, 06/02/2008.)
[75] Ex. 9, Maltby Dep. Tr. 23:24-25:2.
[76] Ex. 5, VanBeest Dep. Tr. 127:9-128:16; *see also* Ex. 9, Maltby Dep. Tr. 23:24-25:2.
[77] Ex. 4 Glover Dep. Tr. 159:10-160:15. Boss Expert Reports 2 and 3.
[78] Polaris (formerly known as the Polaris Project) is a leading U.S. nonprofit organization dedicated to ending modern-day slavery and human trafficking. For two decades Polaris has operated the U.S. National Human Trafficking Hotline. https://polarisproject.org/
[79] Ex. 13, Polaris Guidance.
[80] Ex. 4(a). (Exhibit 10, Glover Dep., G6(AW)0001693-94.)

29.  G6 worked too with ECPAT (End Child Prostitution, Child Pornography and Trafficking in Children for Sexual Purposes), recognizing it and Polaris are leaders in the industry.[81] █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████.[82]

30.  According to the email thread, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████[83] The thread also mentions █████████████████████

█████████ "█████████████████████████████████████████"[84]

31.  Ultimately, G6 did not implement Polaris's recommendations, █████████

████████████████████████████████████████████████████, █████

████████████████████████████████████████████████████████████

█████████████████████████████████████"[85] ██████████████████

████████████████████████████████████████████████████████████

████████████████████ "███████████████████████████████████████"

32.  Polaris had to r████████████████████████████████████████████

████████████████████████████████████████████████.[86] Despite Polaris' recommendations, ███████████████████████████████████████

████████████████████████████████████████████████████████████



---

[81] Ex. 3, Walker Dep. Tr. 231:19-232:10. G6 did not sign the ECPAT Code until 2019.
[82] Ex. 3, Walker Dep. Tr. 234:9-15.
[83] Ex. 4, Glover Dep. Tr. 133:6-136:18.
[84] *Id*. Ex. 4(a). G6(AW)0001693-1695.
[85] *Id*.
[86] Ex. 4(a); Exhibit 13, Glover Dep., G6(AW)0001741, 09/29/2014. Ex. 4, Glover, Dep. Tr. 142:1-13.

███████.[87] G6 Training began in 2016 ████████████████████

████████████████████████████████.[88] E████████████████

████████████████████████[89] Such information would have to have been ███████

██[90]

## G. G6 Knew of The Risk of Sex Trafficking Occurring Across Its Hotels, G6 Failed to Implement Company-Wide Changes to Address this Risk

33. ████████████████████████████████████████

██████████████████████████████████.[91] ████████████████

███████[92] ████████████████████████████;[93] Did nothing to determine

████████████████████;[94] ████████████████████████

████████████t;[95] and ████████████████████████

████████████████████████████.[96]

34. In 2014, b████████████████████████████████

████████████████████████████.[97] Santos claims ████

████████████████████████████████████.

35. Despite t████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[87] Ex. 4, Glover Dep. Tr. 143:1-12.
[88] Ex. 4, Glover Dep. Tr. 142:24-149:2; Ex. 4(a). Exhibit 14, Glover 2 352.
[89] Ex. 4, Glover Dep. Tr. 150:4-151:10.
[90] *Id*.
[91] Ex. 4 Glover Dep. Tr. 214:2-23.
[92] Ex. 4, Glover Dep. Tr. 196:10-200:18; Ex. 4(a). Glover Exhibits 18, 19, and 20.
[93] Ex. 7, Santos Dep. Tr. 186:1-12.
[94] Ex. 7, Santos Dep. Tr. 63:15-19.
[95] Ex. 7, Santos Dep. Tr. 227:19-22.
[96] Ex. 7, Santos Dep. Tr. 178:8-25.
[97] Ex. 7, Santos Dep. Tr. 168:15-170:6; Ex. 7(a); Ex. 5 to Santos Dep., G6(AW)0002010)

███████████. [98]In contrast, it took G6 six months to a year to develop and implement company-wide ███████████████████████████████████████████ ██████.[99] While it is G6's business to put ██████████,[100] it should not come at the expense of blatantly profiting from sex trafficking.

36.     ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████:[101] Santos ████████████████████████████████████████████████████████████ ████████████████████h.[102]



37.     G6 had no way of knowing if its training was effective. In the training industry, it is standard to evaluate the effectiveness of employee training using tools like post-training quizzes/tests and surveys for feedback.[103] This standard is set by the Kirkpatrick model (an industry-standard training evaluation framework) ████████████████████████████ ████████████████████████████████████████████████████[104]

38.     An "industry standard" s██████████████████████████████████████ ████████████████████████████████████████████.[105] ████████████████████ ████████████████████████████████████████[106]

[98] Ex. 4, Glover Dep. Tr. 143:1-12.
[99] Ex. 7, Santos Dep. Tr. 180:16-183:4.
[100] Ex. 7, Santos Dep. Tr. 85:24-86:21.
[101] Exhibit 7(a). Santos Dep., G6(AW)001512, 05/21,2015. Ex. 7, Santos Dep. Tr. 185:18-25.
[102] Exhibit 7(a). Santos Dep., G6(AW)001512, 05/21,2015.) Ex. 7, Santos Dep. Tr. 185:9-186:12; Ex.4, Glover Dep. Tr. 147:8-17.
[103] Ex. 7, Santos Dep. Tr. 199:4-200:10.
[104] Ex. 7, Santos Dep. Tr. 199:4-200:10, Ex. 7(a).
[105] Ex. 7, Santos Dep. Tr. 199:4-9.
[106] Santos Dep., 199:10-18, 201:9-19.

39.     This decision was made despite Santos █████████████████████████

█████████████████████.[107] Santos stated she did not know █████████████████

████████████████████████████████████████████████████████████████████████████

███████.[108] Even after G6 did implement human trafficking training, it fell below the

acknowledged industry standard. █████████████████████████████████████████████

███████████████████████████████"[109] If G6 followed industry standards when assessing

and addressing risk, it would have developed systems, policies, and procedures that would have

identified, prevented, or deterred the alleged trafficking in the instant matter.[110]

## STANDARD

G6 "bears the initial burden of 'show[ing] that there is an absence of evidence to support

the nonmoving party's case.'" *Ebrahimi v. Liberty Oilfield Servs., LLC*, No. CIV 24-0340 JB/GBW,

2025 LX 328466, at *4-5 (D.N.M. Aug. 29, 2025); Fed. R. Civ. P. 56(a). The party opposing a

motion for summary judgment must "set forth specific facts showing that there is a genuine issue

for trial as to those dispositive matters for which it carries the burden of proof. Id.

G6 has not carried its initial burden by disregarding material evidence, drawing inferences

in G6's favor, and adopting a textual narrowing of § 1595(a) that conflicts with this Court's prior

rulings. Even assuming arguendo that G6 met its initial burden, the record evidence creates

genuine issues of material fact as to each element of A.F. beneficiary liability claim.

## ARGUMENT

This Court has engaged in a sophisticated analysis of direct beneficiary liability under the

TVPRA in *Doe v. Sheraton, LLC*, No. 23CV00451 KG/JMR, 2024 U.S. Dist. LEXIS 58311 (D.

---

[107] Ex. 7, Santos Dep. Tr. 186:20-187:24.
[108] Ex. 7, Santos Dep. Tr.222:6-15.
[109] Ex. 7, Santos Dep. Tr. 233:9-15.
[110] Ex. 11 and Ex. 12, Boss Expert Reports.

N.M. Mar. 28, 2024). "After reviewing numerous cases, th[is] Court" adopted the framework to determine a direct beneficiary claim under § 1595 set out in *M.A. v. Wyndham Hotels & Resorts, Inc*. 425 F. Supp.3d 959, 964 (S.D. Ohio 2019):

> (1) knowingly benefitted, financially or by receiving anything of value, (2) from participation in a venture that, (3) they knew or should have known has engaged in an act in violation of the TVPRA.

*Id*. at *7 (citing 18 U.S.C. § 1595(a)).

While G6 cites this Court's decision in *S.C. v. Sheraton* and *M.A. v. Wyndham*, it ignores the standard that this Court adopted and instead sets forth a four-prong test utilized in *Doe #1 v. Red Roof Inns*, 21 F.4th 714, 723 (11th Cir. 2021). Basically, this test breaks the "participation in a venture" section into two separate elements. Plaintiff will, therefore, follow this Court's guidance using the three-prong test, and address both venture elements within the "participation in a venture" section to address all of G6's arguments.[111]

**A.      Participation in a Venture**

> *1.      A venture which has engaged in an act in violation of Section 1591.*

Defendant argues that Plaintiff was not trafficked by the alleged venture. (Mot. for Summ. J. at 14.) G6 does not cite to any law developed under the TVPRA in this section and instead asks this Court to analogize the law of conspiracy to reach the conclusion G6 seeks. *Id*. at 15. Respectfully, his Court to decline G6's invitation and look to law specifically developed under the

---

[111] Plaintiff notes that G6 relies heavily on the early overly restrictive Eleventh Circuit cases. Indeed, even the Eleventh Circuit itself has lowered the evidentiary burden for victims of trafficking adopting a more expansive view of liability. *A.G. v. Northbrook Indus*., 171 F.4th 1257 (11th Cir. 2026) (reversing district court's grant of summary judgment).

TVPRA. In a recently issued decision on summary judgment a sister district court that sets out a persuasive analysis of this issue. *Doe v. Radisson Hosp., Inc.*, No. 1:23-CV-1456-RP, 2026 LX 274912 (W.D. Tex. May 19, 2026)

Specifically, *Doe v. Radisson* explained that "Section 1591 criminalizes causing a 'person to engage in a commercial sex act' through 'means of force, threats of force, fraud, coercion . . . or any combination of such means.'" *Id*. at *27-28 (citing18 U.S.C. § 1591(a)).

> Section 1595 does not define "venture," but other courts have defined it as an "undertaking that is dangerous, daring, or of uncertain outcome," or a "business enterprise involving some risk in expectation of gain." *Doe 1 v. Apple Inc.*, 96 F.4th 403, 414, 464 U.S. App. D.C. 426 (D.C. Cir. 2024) (first quoting *Venture*, The American Heritage Dictionary of the English Language (4th ed. 2000); and then citing *Venture*, Black's Law Dictionary (8th ed. 2004)). *See also Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021) (citations omitted) (defining a "venture" as an "undertaking or enterprise involving risk and potential profit").

*Id*. at *28, and footnotes.

As did the plaintiff in *Doe v. Radisson*, A.F. testified that her trafficker used force or the threats of force to cause her to engage in commercial sex acts, after which the trafficker took the money paid by the johns. "Such acts are surely an 'enterprise involving risk and potential profit,' such that they qualify as a venture." 2026 LX 274912, at *27-28 (citing *Apple Inc.*, 96 F.4th at 414; *Red Roof Inns, Inc.*, 21 F.4th at 725). In other words, the venture was between the john and the trafficker.

G6 seems to suggest that A.F. is partly to blame or being trafficked based on her "traumatic and troubled past," where she "attempted suicide at age 13; was raped at age 19, resulting in her first pregnancy and child; was subjected to domestic violence by multiple ex-partners; has a history of drug abuse, suicidal ideations, and self-mutilation; and has lost custody of all four of her children." (G6 Mot. for Summ. J. at 2,) G6 throughout its motion implies that A.F.'s trauma (both

past and present) is the reason as why Plaintiff was *not* forced to sell her body for sex. *Doe v. Radisson*, again, is helpful here finding a similar argument near-frivolous:

> The Court rejects A&D's near-frivolous argument that "[n]either force, coercion, nor fraud drove [her] into the commercial sex trade" because her "addiction to drugs drove her into the trade" since at least 2011, when she worked at strip clubs and massage parlors. (MSJ, Dkt. 168, at 12-13).. . .H.E.W. has therefore raised a genuine fact issue as to whether her traffickers were engaged in a venture that violated § 1591.

2026 LX 274912, at *29-30.

A.F.'s trafficker exploited A.F.'s vulnerability, by outright beating her into submission as well as coercing her through isolation, monopolization of  perception, induced debility and exhaustion, threats, occasional indulgences, demonstrating omnipotence, and degradation.  break down their self-esteem and make them more compliant.[112]

### 2.    *Participation in the venture including a commercial venture*

"Congress has not defined the phrase under Section 1595. In 2018, however, it amended Section 1591, the criminal sex trafficking statute, to define " participation in a venture " as "knowingly assisting, supporting, or facilitating a violation " of Section 1591(a)(1). "Participation" simply means "taking part." *See* Participation, Black's Law Dictionary (12th ed. 2024).

The Seventh Circuit defines "participation" as requiring **"**only 'a desire to promote the wrongful venture's success,'" regardless of "actual knowledge of criminal wrongdoing." *G.G.*, 76 F.4th at 559 (quoting *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003)).  A "venture," the Seventh Circuit continued, "can certainly run the gamut from an *isolated act of sex trafficking* to an international sex-trafficking enterprise." *Id*. Thus, even if Defendants were correct that A.F.

---

[112] Robitz, M.S., Expert Report, Dkt. 195 (citing Baldwin, S.B., A.E. Fehrenbacher, and D.P. Eisenman, *Psychological Coercion in Human Trafficking: An Application of Biderman's Framework.* Qual Health Res, 2015. 25{9}: p. 1171-81.

was only at the Albuquerque Motel 6 three times, that is sufficient to raise a genuine issue of fact related to this element.

As with "venture," courts "liberally[] construe 'participation,'" explaining that it "does not require more than 'assisting, supporting, or facilitating' a venture that violates Section 1591." *Id*. at 558–59 (quoting 18 U.S.C. § 1591(e)(4)). Consistent with the Southern District of Ohio in *M.A.*, the Seventh Circuit noted that "providing hotel rooms . . . would satisfy Section 1595's 'participation' element." *See id*. at 559 ("While direct involvement in sex trafficking itself (e.g., transporting victims, *providing hotel rooms*) would satisfy Section 1595's "participation" element, direct involvement goes beyond what the statutory text requires." (emphasis added)).

G6 argues that the evidence shows that A.F. was only at the Motel 6 three times and thus it is not sufficient to constitute a "continuous business relationship." (Mot. for Summ. J. at 12-13.) Again, G6 ignores the evidence of numerous stays that would easily allow a reasonable jury to conclude that Plaintiff and her trafficker stayed in Albuquerque Motel 6 more than enough to show a continuous business relations. A party's own testimony, even if self-serving and uncorroborated, may be sufficient to establish a fact issue. *See C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co.*, 453 Fed. Appx. 439, 443 (5th Cir. 2011) (per curiam) ("A party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone. . . . Instead, an affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving."); *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) (per curiam) (citing *United States v. Stein*, 881 F.3d 853, 859 (11th Cir. 2018)) ("A non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment, even if the affidavit is self-serving and uncorroborated."). Moreover, even if she was only at the location three times, which is not the case, the number of times at a  location is not an element of

19

a beneficiary liability claim. There can certainly be scenarios where three or less days of being sold for sex would meet the elements of a TVPRA claim. *G.G.*, 76 F.4th at 559

Next, G6 focuses solely on Plaintiff A.F. and her personal story of trafficking at the Motel 6. But there is no requirement that G6 have had knowledge of any particular victim—negligence that the "venture" violated § 1591 as to *any* victim is enough. *G.G. v. Salesforce.Com, Inc.*, 76 F.4th 544, 557 (7th Cir. 2023); *see also Fleites v. MindGeek S.A.R.L.*, No. 2:21-cv-04920-WLH-ADS, 2025 U.S. Dist. LEXIS 190592, at *51 (C.D. Cal. Sep. 26, 2025).

In *G.G.*, the Seventh Circuit explained that if Congress had meant that the defendant "must have had actual or constructive knowledge of the specific victim, it could have simply said so. It did not." 76 F.4th at 556. Requiring knowledge of the specific victim or act "goes two bridges too far." *G.G.*, 76 F.4th at 556. The Seventh Circuit reasoned, that "[i]f such specificity were required, Section 1595 would be severely undermined in some of the most egregious cases." *Id.* at 557. A company "could simply bury its head in the sand with respect to individual victims." *Id.* For instance, it could work "only with high-level data" to shield itself from knowledge. *Id.* A taxi service could install a black shield between passengers and drivers so that its drivers would never see any particular human trafficking victims. *Id.*

G6 further contends that this Court should look at the pleadings to determine what kind of venture Plaintiff pleaded, as did Eleventh Circuit. (Mot. for Summ. J. at 9.) G6 highlights that the *Red Roof Inns* "plaintiffs alleged ventures that comprised 'traffickers, the hotel's employees, management, owners, and franchisor, as well as others involved in … sex trafficking.'" G6 then assert that A.F. frames her venture the same. Not so. A.F. alleges that "G6 breached this duty by facilitating human trafficking through its participation in a commercial business venture which involved the harboring of Plaintiff and her trafficker for the purposes of commercial sex induced

by force, fraud, or coercion." (Am. Compl. ¶¶ 24(d)). These allegations bear little resemblance to those in the Red Roof case.

G6 in this same vein argues that Plaintiff may try to "pivot to allege a so-called 'commercial business venture theory" and should not be allowed to do amend her complaint in an opposition brief. Courts, however, regularly find that commercial ventures satisfy this element of the TVPRA. See *A.W. v. Red Roof Inns, Inc.*, No. 2:21-cv-04934, 2022 U.S. Dist. LEXIS 227437, at *22 (S.D. Ohio Dec. 16, 2022) ("The question is whether the Defendant participated in a commercial venture related to A.W.'s trafficking by receiving "payment for rooms," "payments or kickbacks for internet usage," or by maintaining "the loyal customer base that fuels the supply and demand of sex trafficking."). And, Plaintiff has easily sufficiently pleaded a commercial venture and has no need to amend. (Am. Compl. ¶ 89) ("G6 breached this duty by facilitating human trafficking through its participation in a commercial business venture which involved the harboring of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.").

**B.      Knew or Should have Known**

Section 1595 requires Plaintiff to show that G6 "knew or should have known" that the venture from which they benefitted "has engaged in an act in violation of" the TVPRA. *See* 18 U.S.C. § 1595(a). "To satisfy this element, [A.F.] need only show that "Defendants 'should have known' about the nature of the venture under a negligence standard." *M.A.*, 425 F. Supp. 3d at 966. No "evidence of actual knowledge or conspiracy between Defendants and the trafficker[s]" is required to satisfy this element. *See id*. Nor is Plaintiff required to prove "that the defendant knew or should have known of the *specific* victim who has brought the civil action." *See G.G.*, 76 F.4th at 558 (emphasis added). Evidence "that Defendants were on notice about the prevalence of

sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence," and evidence "specific to [Plaintiff's] own sex trafficking, including a number of signs she alleges should have alerted staff to her situation," can satisfy the negligence standard under Section 1595(a). *M.A.*, 425 F. Supp. 3d at 968.

Viewed most favorably to M.A., the evidence suggests that, despite the ubiquitous presence of prostitution at Defendants' properties and Defendants' awareness of sex trafficking indicators, Defendants failed to take appropriate security measures; to install cameras in certain parts of the hotel; to train staff to recognize red flags; and to implement anti-trafficking policies or measures.

Similarly, a company's "failure to implement policies sufficient to combat a known problem" in its operations can "rise to the level of" negligence or even willful blindness. *M.A.*, 425 F. Supp. 3d at 968. The training director testified that the Kirkpatrick Method is the industry standard to evaluate the effectiveness of training and educational programs yet admits that G6 did not utilize that method. In other words, the head of training, who drafted the manager in training human trafficking training, did not administer utilize the learning industry guide, or other similar program, to evaluate the human trafficking training. As one Yale scholar states: "Hoteliers enable the underground commercial sex economy and allow it to flourish, . . .[and their training attempts] are largely ineffective. Occasionally spurred to action by the threat of civil or criminal litigation, hotels, on the whole, have remained too complacent to this human rights violation."[113]

Because beneficiary liability involves a "*negligence* standard, not a willful blindness or a reckless disregard standard," a failure to implement basic protections breaches the standard of care. *Fleites*, 2025 U.S. Dist. LEXIS 190592 at *51 (emphasis in original). Here, G6 knew or should

---

[113] Decl. of Counsel, Ex. 14, Rothberg, Rachel, Risky Business: Holding Hotels Accountable for Sex Trafficking, Yale Law & Policy Rev. 38:265 (2019).

have known that it had a problem with trafficking as early as 2008, when G6 learned that prostitution was occurring at Motel 6 properties and was being arranged through BackPage. BackPage is a sex trafficking site, as recognized by 21 state attorneys general who called on BackPage to "shut down its adult services section" in 2010. *G.G. v. Salesforce.Com, Inc.*, 76 F.4th 544, 555 (7th Cir. 2023). The San Francisco Chronical "published no fewer than 400 prominent news articles about Backpage between 2009 and 2017, including several in 2012 linking Backpage to child sex-trafficking." *Id.* And a 2013 article "revealed that the FBI was monitoring Backpage after rescuing more than 100 children from forced prostitution." *Id.*

The Polaris Project reached out to G6 many times from 2011 to Plaintiff's trafficking period, encouraging G6 to train its staff on sex trafficking. G6 is able to develop major training programs, such as its HotelKey training program, within six months to a year—even starting from scratch. Even though "off-the-shelf" training programs were available to G6, however, it failed to implement human trafficking trainings until 2016.

Even then, G6's team edited out key "red flags" of trafficking. Police in different cities had repeatedly warned G6 to stop allowing individuals to pay in cash, to stop renting to locals, and to require deposits up front—in other words, to stop allowing locals to pay for rooms with money they had earned during their stay. G6 refused to implement these protections at any of its properties. Thus, G6 failed to implement basic protections to avoid benefiting from human trafficking. While G6 may have avoided learning the individual names and details of many of its victims, it still knew or should have known of the violations of § 1591(a) occurring at its branded locations.

## C.     Knowingly Benefitted

This element requires A.F. to raise a genuine issue of material fact as to whether G6

"knowingly benefitted, financially or by receiving anything of value" from participating in the alleged venture. 18 U.S.C. § 1595(a); *see M.A.*, 425 F. Supp. 3d at 964. The evidence shows that G6 rented rooms to and for Plaintiff where she was raped for money given to her trafficker and that Plaintiff's trafficker also rented rooms during the trafficking period. This evidence satisfies this element. A.B., 484 F. Supp. 3d at 936 ("The 'knowingly benefits financially ' element of § 1595 'merely requires that Defendant knowingly receive a financial benefit' and the rental of a hotel room or royalties from that rental constitutes a financial benefit sufficient to meet this element.") G6 makes the remarkable argument that, even if it did profit from the room, it was only $100. This argument is of no moment—profit is profit.

Further, the evidence is uncontroverted that Plaintiff's trafficker used the internet at the Albuquerque Motel 6 to post advertisements to rape A.F. G6 had access to much of this data through the management of a centralized data system, including but not limited to the booking, credit processing, and information technology and internet systems. "These data transfers help form the basis of Plaintiff's TVPRA claim against all Defendants, as they implicate the elements of the beneficiary theory of liability. Each transfer was certainly more than the 'mere transmission of information' passing through a server. *H.M.L. v. Red Roof Inns, Inc.*, No. 2:24-cv-03919, 2026 LX 199000, at *22 (S.D. Ohio Mar. 30, 2026) (citations omitted). It is also uncontroverted that G6 knew that G6 was making money from prostitution being set up on the internet to occur at Motel 6 properties. Glover Ex 3 and 98:19-25 through 103:10.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully asks this Court to **DENY** Defendant's Motion for Summary Judgment. (Dkt. 130.)                    Respectfully submitted,

/s/ *Penny L. Barrick*
Penny L. Barrick (OH 0074110)

24

Steven C. Babin, Jr. (OH 0093584)
**BABIN LAW, LLC**
10 W Broad Street
Suite 900
Columbus, Ohio 43215
P: 614.761.8800
F: 614.706.1775
C: 614.747.6184
penny.barrick@babinlaws.com
steven.babin@babinlaws.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2026, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's case management and electronic filing system. Parties may access this filing through the Court's case management and electronic filing system.

Respectfully Submitted,

***Penny L. Barrick.***
Penny L. Barrick