IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

A.F.,

Plaintiff,

v. 1:23-cv-00879-KG-GBW

G6 HOSPITALITY LLC,

Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant G6 Hospitality's Motion for Summary Judgment, Doc. 130, Plaintiff A.F.'s Response, Doc. 202, and Defendant's Reply, Doc. 216.[1] This Court has determined that the evidence is insufficient to show that Defendant participated in the sex trafficking venture. In doing so, the Court does not minimize the troubling allegations that Plaintiff presents. Even so, the Court grants Defendant's motion, Doc. 130, and dismisses the action.

## *I. Statement of Undisputed Material Facts*[2]

Plaintiff alleges that her former partner, P.F., trafficked her at the Motel 6 located at 8510 Pan American Freeway NE in Albuquerque, New Mexico (the "Motel"), from January 2017 until September 2018. Doc. 202-2 at 2–3. Defendant owns, supervises, manages, controls, and operates the Motel. Doc. 40 at 5–6; Doc. 130 at 2–3.

[1] Pursuant to the protective order entered in this case, Doc. 23, the Court refers to Plaintiff by her initials, "A.F.," and to her alleged trafficker by his initials, "P.F."

[2] Unless otherwise noted, the following summary of material facts is drawn from the undisputed portions of the record and the exhibits attached to the Motion for Summary Judgment, Doc. 130, the Response, Doc. 202, and the Reply, Doc. 216. The Court cites the unredacted versions of Defendant's Motion and supporting exhibits, which are sealed and lodged at Docs. 132-1 through 132-8, and the unredacted versions of Plaintiff's Response and supporting exhibits, which are sealed and lodged at Docs. 205-1 through 205-15.

***A. Plaintiff's relationship with P.F.***

In 2013, Plaintiff and P.F. met through mutual friends and became romantically involved. Doc. 132-2 at 6–7. Throughout their relationship, the couple lacked stable housing, moving between family members' homes, various hotels, and Plaintiff's car. *Id.* at 6–7, 14. P.F. physically abused Plaintiff—he "beat [her] up so many times" that she now suffers memory loss and has trouble with recall. *Id.* at 11–12, 25.

In 2018, P.F. almost strangled Plaintiff to death. *Id.* at 15, 19. P.F. was arrested, convicted of aggravated assault, and sentenced to three years' incarceration. *Id.* at 15, 19–20. Plaintiff ended contact with P.F. while he was incarcerated. *Id.*

***B. Plaintiff's stays at the Motel***

Plaintiff stayed at the Motel multiple times during the relevant period, sometimes with P.F. *Id.* at 11, 24–25, 27. Defendant's booking records reflect three reservations under Plaintiff's name and four under P.F.'s name. Doc. 132-4 at 3. Plaintiff testified that she and P.F. stayed at the Motel on other occasions in rooms reserved under family members' names, estimating that they stayed there ten times in total. Doc. 132-2 at 24, 28.

P.F. began forcing Plaintiff to engage in commercial sex around 2016, often at the Motel. *Id.*; Doc. 132-8 at 3. Plaintiff states that P.F. beat her until she submitted to being photographed nude. Doc. 132-2 at 17, 30. He then used the Motel's Wi-Fi to post the photographs to Plaintiff's social media profiles, representing that she "wanted a rape situation." *Id.* at 27, 30.

Plaintiff testified that she was abused by "many different" men during the relevant period and described two rapes in detail. *Id.* at 16–17. First, Plaintiff testified that she was staying alone at the Motel, in a room booked by her parents. *Id.* at 18. Plaintiff returned from an outing to unexpectedly find both P.F. and an unidentified man inside the room. *Id.* According to

Plaintiff, the unidentified man forced her to engage in sexual intercourse while P.F. filmed and masturbated. *Id.* at 18–19, 25–26. Plaintiff begged P.F. to "get [the man] to stop." *Id.* at 26. After the man left, P.F. told Plaintiff that she had "failed" him and "threw [her] 20 bucks." *Id.*

On another occasion, Plaintiff booked a motel room under her own name, and P.F. was "not supposed to be there." *Id.* at 25–26. Nevertheless, Plaintiff entered the room to find P.F. "sitting there with his pants down"; Plaintiff did not know how he had gained access. *Id.* When the door shut behind her, a stranger wearing a mask emerged from the bathroom and attacked her. *Id.* Plaintiff "fought for a good minute" before the man realized she was really crying. *Id.* He threw money at P.F., said they "would try this again later," and left. *Id.* Plaintiff testified that she did not report the trafficking because she feared for her life and did not believe that her children were "safe" until P.F. was incarcerated. *Id.* at 30.

Plaintiff testified that the rooms in which she was trafficked were always booked under her own name or a family member's name, that P.F. "never" rented those rooms, and that she checked in to the Motel with P.F. "maybe once." *Id.* at 18, 27–28. When staying at the Motel, Plaintiff primarily interacted with one staff member, a "heavy-set Hispanic woman in her mid-thirties" who was "not very friendly." Doc. 202-2 at 6; Doc. 132-2 at 28. She also interacted with a man who "worked in the morning sometimes." Doc. 132-2 at 28. Her interactions with Motel employees were limited to routine matters, such as check-in. *Id.* at 29. Plaintiff testified that she walked "right by" the front desk with black eyes and bruises, and that the employees "had to have seen" them. *Id.* at 32–33.

### *C. Defendant's sex trafficking policies*

Defendant was aware of sex trafficking concerns at some of its properties during the relevant period. Doc. 205-5 at 5. As early as 2008, Defendant's Head of Security wrote an

email stating that "internet prostitution" was "going to be a problem for [G6] for a long time to come" and "there is just no way to weed it out." Doc. 205-6 at 2. In 2012, Defendant internally discussed a human trafficking incident involving a minor at a property in Orlando, Florida, and considered partnering with the Polaris Project, an organization focused on combating human trafficking. *Id.* at 5–6. Defendant later developed and implemented trafficking-related training materials in 2016 that identified trafficking indicators and instructed employees to report suspected trafficking activity. Doc. 205-5 at 9, 11–13, 17.

During the relevant period, two Google reviews of the Motel referenced apparent prostitution at the property. Doc. 205-12 at 2. The first, dated September 8, 2017, stated that "[p]rostitutes were in and out during the evening while it was still light and their pimps waited in the parking lot," and that conditions were "so bad there is security watching the parking lot all night." *Id.* The second, dated December 7, 2017, stated: "This is the worst I've ever seen. Prostitutes coming in and out." *Id.*

Defendant also maintained a key-issuance policy that required front-desk employees to check identification and confirm that an individual was a registered guest before issuing a room key. Doc. 205-4 at 5. A corporate representative testified that the policy included an exception: if an employee had observed a couple together and "knew for sure" that "they had a relationship," the employee could issue a key without verification. *Id.*

***D. Procedural history***

In the Amended Complaint, Plaintiff asserts a single claim against Defendant under 18 U.S.C. § 1595 of the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Doc. 40 at 17–18. Plaintiff alleges that she is a victim of sex trafficking under 18 U.S.C. § 1591(a) and that Defendant is therefore liable under § 1595. *Id.* She contends that Defendant participated in

and benefited from her trafficking by maintaining business practices that facilitated sex trafficking. *Id.* She further alleges that Defendant knowingly benefited from the venture because P.F. paid for hotel rooms and related services. *Id.* She seeks damages for medical expenses, lost wages, emotional distress, and pain and suffering. *Id.* at 19.

Defendant now moves for summary judgment, arguing that Plaintiff cannot establish a violation of the TVPRA as a matter of law. *See* Doc. 130 at 8. Plaintiff opposes the motion, arguing that genuine disputes of material fact exist as to each element of her claim. *See* Doc. 205-1 at 1.

## *II. Legal Standards*

### *A. Summary judgment*

Summary judgment is warranted if the movant establishes that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020). The defendant bears the burden of negating at least one of the essential elements upon which the plaintiff's claim is grounded. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Once the movant meets this burden, the nonmovant is required to demonstrate that there is a genuine dispute for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).

In applying this standard, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The parties must support factual

allegations with evidence, and the Court is free to consider materials such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). The nonmovant cannot rely on conclusory allegations or conjecture to avoid summary judgment. *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022). Rather, a "plaintiff's version of the facts must find support in the record." *Koch v. Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011).

### *B. The TVPRA*

Section 1591(a)(1) of the TVPRA prohibits knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting a person for a commercial sex act through force, threats of force, fraud, or coercion. In 2003, Congress amended the TVPRA to create a civil cause of action for trafficking victims to sue "perpetrator[s]" for damages. Pub. L. 108-193, sec. 4(a), 117 Stat. 2875, 2878. This includes claims against persons who "knowingly benefit[], financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." § 1595(a) (2022); Pub. L. 110-457, § 221, 122 Stat. 5044, 5067. The Court refers to the additional claim against "whoever knowingly benefits" as a "beneficiary claim." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). To state a beneficiary claim, a plaintiff must allege facts which show that defendant (1) knowingly benefitted, financially or by receiving anything of value, (2) from participation in a venture, that (3) it knew or should have known has engaged in an act in violation of the TVPRA. § 1595(a); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019).

## *III. Analysis*

Summary judgment is warranted because there is insufficient evidence as to the third element of a beneficiary claim: that Defendant participated in the trafficking venture. The Tenth

Circuit broadly defines a "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." *Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (quoting 18 U.S.C. § 1591(e)(6)). As a general principle, a plaintiff need not show that the defendant committed an "overt act" of trafficking to satisfy § 1595's participation requirement. *Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117, at *6 (D. Colo.); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 561 (7th Cir. 2023). At the same time, "observation is not participation under § 1595." *A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257, 1269 (11th Cir. 2026); *see also G.G.*, 76 F.4th at 563–64 (reading § 1595's "participation in a venture" "to require more than mere passive nonfeasance or an arm's length, passive, and largely indifferent relationship" with a trafficker) (citation and internal quotation marks omitted). A plaintiff must identify "something more," *A.G.*, 171 F.4th at 1269, to "connect the dots between [her] particular experience as a victim of trafficking and the specific defendant in the case." *J.G. v. Northbrook Industries, Inc.*, 619 F. Supp. 3d 1228, 1235 (N.D. Ga. 2022).

Plaintiff urges the Court to "liberally construe participation" such that providing hotel rooms with constructive knowledge of trafficking would suffice for liability. Doc. 205-1 at 19. The Court declines to do so because that interpretation would collapse § 1595's separate participation and knowledge requirements into a single inquiry. Under Plaintiff's reading, a defendant could be deemed to have participated in a trafficking venture because it provided ordinary commercial services while failing to recognize that trafficking was occurring. Congress, however, included participation as a distinct element of beneficiary liability, and courts must give effect to each statutory requirement. The Court therefore declines to adopt Plaintiff's interpretation because it would render the participation requirement superfluous. *Bridger Coal Company/Pacific Minerals, Inc. v. Director, O.C.W.P.*, 927 F.2d 1150, 1153 (10th

Cir. 1991) (noting the Court "will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous").

Instead, courts have identified two ways that a plaintiff may establish the required connection between a defendant and a trafficking venture—by showing that the defendant directly participated in the venture or maintained a continuous business relationship with the trafficker. *J.G.*, 619 F. Supp. 3d at 1235. Plaintiff unsuccessfully establishes either theory.

***A. There is no evidence that Defendant directly participated in the venture.***

First, a plaintiff may establish participation by demonstrating "a direct association between the defendant and the plaintiff's trafficker." *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1188 (D. Colo. 2025). This inquiry focuses on whether the "particular services the defendants provided to the venture were customized or personalized enough to demonstrate a volitional act of association with the venture." *Id.* In the sex trafficking context, a hotel directly participates if it "provid[es] services to...traffickers...that it [does] not provide to the general public." *T.S. v. Wyndham Hotels & Resorts, Inc.*, 2024 WL 3927382, at *10 (D. Minn.).

No reasonable jury could conclude that Defendant directly participated in P.F.'s venture. The summary judgment record reflects that Defendant provided P.F. with routine lodging services in the ordinary course of business—by renting him a room four times.

Plaintiff points to evidence that Defendant issued room keys to P.F., enabling him to enter her room without her consent. Doc. 205-1 at 2. But even if Defendant's key policy created an opportunity for abuse, the record contains no evidence that Defendant provided P.F. access to Plaintiff's room for purposes of facilitating the alleged trafficking. To the contrary, Defendant's corporate representative testified that providing room keys to registered guests and their partners was a standard motel policy. Doc. 205-4 at 5. Plaintiff has identified no evidence that

Defendant deviated from that policy or otherwise afforded P.F. any special accommodation or preferential treatment for sex trafficking.

This case differs from those in which courts have found evidence of direct participation. In *A.G.*, 171 F.4th at 1272, for instance, the hotel owner implemented practices specifically designed to assist known traffickers, including placing sex offenders in the same area of the hotel to "protect" them from being reported by other guests, and instructing housekeeping to clean their rooms once per week. Those measures departed from the hotel's ordinary practices and were put in place specifically to benefit traffickers. *Id.* By contrast, the undisputed evidence here shows only a general hotel policy that applied to all guests. Doc. 205-4 at 5. Therefore, no reasonable jury could conclude that Defendant's issuance of room keys pursuant to that neutral policy constitutes the type of affirmative participation reflected in *A.G.*

***B. There is no evidence that Defendant had a continuous business relationship with P.F.***

Plaintiff nonetheless claims that a reasonable jury could find participation because Defendant maintained a "continuous business relationship" with P.F. Doc. 205-1 at 19–20. The Court disagrees. Although a continuous business relationship may have existed between Defendant and P.F., Plaintiff has not established that it was for the purpose of sex trafficking.

A plaintiff may establish participation by showing that a defendant maintained a "continuous business relationship" with a trafficker: that it repeatedly rented rooms to individuals it knew or should have known were engaged in sex trafficking. *F.C.*, 790 F. Supp. 3d at 1188. Under this theory, a defendant's knowledge of a trafficker's activities can transform otherwise generic hotel services into "assistance, support, or facilitation" reflecting a "tacit agreement." *G.G.*, 76 F.4th at 559–60 (citing *M.A.*, 425 F. Supp. 3d at 970–71). To make this showing, a plaintiff must put forth evidence that the sex trafficking was so "apparent" that the

defendant had at least some knowledge of the trafficking venture itself. *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017); *see J.C. v. Choice Hotels Int'l, Inc. ("J.C. II")*, 2020 WL 6318707, at *7 (N.D. Cal.) (concluding that the plaintiff "plausibly connected the dots" between the defendant hotel and a sex trafficking venture by alleging that the defendants "providing lodging to people it knew or should have known were engaged in *her* sex trafficking") (emphasis in original); *Doe (S.A.S.) v. Hilton Domestic Operating Co. Inc.*, 795 F. Supp. 3d 1294, 1310 (W.D. Wash. 2025) (noting a plaintiff may establish participation through "evidence of an ongoing pattern of activity between the civil defendant and the trafficker" to create the inference that the "defendant knew or should have known they were facilitating *the specific trafficker's venture*") (emphasis added).

The record here does not contain evidence that Plaintiff's trafficking had become sufficiently "apparent" to support an inference that Defendant had a tacit arrangement with P.F. *Ricchio*, 853 F.3d at 555. To start, the only indicia of sex trafficking that hotel employees observed were visible injuries. Doc. 132-2 at 32. But visible injuries, without more, do not put a hotel on notice of a sex trafficking venture. *Keller v. Danford*, 2026 WL 892290, at *6 (D. Utah) (holding that visible bruising alone does not put a hotel on notice of sex trafficking).

Nor does the record establish sufficient context from which hotel personnel could have connected Plaintiff's injuries to a sex trafficking venture. There is insufficient basis to infer that hotel staff was aware that P.F. was trafficking Plaintiff or recognized him as the type of repeat customer associated with trafficking. Plaintiff testified that she checked in with P.F. "maybe once," that P.F. "never" rented the rooms in which she was trafficked, and that she was always trafficked in rooms booked under her own name or that of a family member. Doc. 132-2 at 18, 27. By contrast, in *Ricchio*, a hotel owner exchanged a high five with the trafficker and told him

to "get things going again"—referring to prior dealings—despite witnessing the trafficker abuse plaintiff in broad daylight. Here, there is no evidence of a continuous pattern that would have identified P.F. as Plaintiff's trafficker.

Moreover, the record lacks other common indicia of sex trafficking. There is no evidence, for example, that hotel staff observed Plaintiff wearing provocative clothing; condoms, lubricant, or drug paraphernalia in her room; frequent requests for extra linens; or unusual foot traffic from customers. *See, e.g.*, *J.G.*, 619 F. Supp. 3d; *Doe (S.A.S.) v. ESA P Portfolio LLC*, 2024 WL 3276714 (W.D. Wash.); *S.Y. v. Best W. Int'l, Inc.*, 2021 WL 2315073 (M.D. Fla.). Plaintiff testified that she cried out for help on at least two occasions. However, there is no evidence offered that any hotel employee heard and ignored her cries or that she otherwise alerted hotel staff to the abuse. *See M.A.*, 425 F. Supp. 3d at 968 (finding allegations insufficient where there was no evidence that hotel employees heard plaintiff's cries for help, observed the abuse, or otherwise had notice of the trafficking).

The evidence here, is not sufficient, particularly when compared with those cases in which district courts have found a plausible continuous business relationship. For instance, in *J.G.*, 619 F. Supp. 3d at 1236, hotel employees interacted with the plaintiff while she wore provocative clothing and displayed visible injuries, observed dozens of men entering her room at all hours, saw traffickers loitering in common areas while openly carrying firearms, and discovered condoms, drugs, weapons, and excessive linens when entering her room. Likewise, in *Doe (S.A.S.)*, 2024 WL 3276714, at *2, the plaintiff's traffickers always paid in cash, continuously guarded her in public areas, loitered in common areas while she met with customers, used the hotel's public business-center computer to post advertisements, and forced her to pick up customers in plain view of hotel staff. And in *S.Y.*, 2021 WL 2315073, at *6, hotel

employees observed cash payments for rooms, men entering the plaintiff's room at all hours, a bloodstained room after reported beatings, disturbances caused by customers, and visible signs of physical abuse. By contrast, there is no evidence here that Defendant had knowledge of her sex trafficking specifically. No single red flag, or combination of red flags, is required. But viewed as a whole, the evidence is insufficient to permit a reasonable jury to conclude that Defendant crossed the line from passively providing hotel services to participating in P.F.'s trafficking venture.

Plaintiff's arguments to the contrary are unpersuasive. To start, Plaintiff points to other alleged indicia of sex trafficking, but her assertions are unsupported by the summary judgment record. Plaintiff contends that the following red flags were present:

> [B]ooking and paying for stays one day at a time for several days in a row; obvious signs of illegal drug use; an unusually large number of used condoms left in the trash; large numbers of male visitors to and from [Plaintiff's] room;...noises of altercations and abuse that would have been audible to staff or other rooms; and loitering/soliciting on hotel grounds.

Doc. 205-1 at 6. But she cites no evidence in the summary judgment record supporting these assertions. Instead, she cites allegations from the Amended Complaint, which are insufficient to create a genuine dispute of material fact at summary judgment. *See id.* at 6 n.35. The summary judgment record actually contradicts several of these purported red flags. For example, Plaintiff testified that she did not loiter in the Motel's common areas and that her interactions with Motel employees were routine. *Id.* at 28–29. Although the Court must draw reasonable inferences in Plaintiff's favor at this stage, it need not accept assertions that lack evidentiary support. *Koch*, 660 F.3d at 1238 (noting that to defeat summary judgment, a "plaintiff's version of the facts must find support in the record"). Accordingly, Plaintiff's unsupported list of purported trafficking indicators is insufficient to defeat summary judgment.

Next, Plaintiff argues that the record lacks evidence of trafficking-related red flags because Defendant "did not ask her about any of these red flags." Doc. 205-1 at 7. This argument misapprehends the summary judgment standard. As the nonmovant, Plaintiff bears the burden of identifying evidence in the record from which a reasonable jury could find in her favor. She therefore must present affirmative evidence that Defendant observed or should have recognized additional trafficking indicators, whether through her own testimony, testimony from hotel employees, or other record evidence. Without evidence that Defendant observed or should have recognized the trafficking venture, Plaintiff cannot transform the passive provision of hotel services into knowing participation.

Finally, Plaintiff's reliance on *G.G.*, 76 F.4th, is misplaced. See Doc. 205-1 at 20. Plaintiff argues that, to show participation, she need not identify evidence connecting Defendant to her trafficking specifically. But *G.G.*'s discussion of constructive knowledge arose in the context of the TVPRA's separate knowledge element—not the participation element at issue here. *See G.G.*, 76 F.4th at 563–64. Whether Defendant had constructive knowledge of Plaintiff's trafficking is a distinct inquiry that the Court does not reach. To show that Defendant actually *participated* in the venture, a greater showing is required.

The factual allegations of this case are troubling. Nevertheless, summary judgment is warranted because there is insufficient evidence demonstrating that Defendant participated in the sex trafficking, and that element is dispositive.

### *IV. Conclusion*

For the reasons above, Defendant's Motion for Summary Judgment, Doc. 130, is granted. Accordingly, it is ordered that:

1. Judgment shall be entered in favor of Defendant on Plaintiff's claim against it (Count I of the Amended Complaint); and
2. The Clerk shall terminate this action.

IT IS SO ORDERED.

/s/Kenneth J. Gonzales____________________
CHIEF UNITED STATES DISTRICT JUDGE

- Please note that this document has been electronically filed. To verify its authenticity, please refer to the Digital File Stamp on the NEF (Notice of Electronic Filing) accompanying this document. Electronically filed documents can be found on the Court's PACER public access system.